UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DAWN-MICHELE MOUSTARIS**,            Case No. 5:12 CV 1787

       Plaintiff,            Magistrate Judge James R. Knepp II

  v.            MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

       Defendant.

## INTRODUCTION

Plaintiff Dawn-Michele Moustaris filed a complaint against the Commissioner of Social Security seeking judicial review of the decision to deny Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405 (g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the Court affirms the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

On February 11, 2008, Plaintiff filed an application for DIB alleging a disability onset date of November 9, 2006. (Tr. 98). She claimed she was disabled due to fibromyalgia, depression, and anxiety. (Tr. 113). Her claims were denied initially and on reconsideration. (Tr. 70-73, 76-78). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 79). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ concluded Plaintiff could perform a full range of light work and was not disabled. (Tr. 26, 30, 36). The Appeals Council denied Plaintiff's request for review (Tr. 1-4), making the

hearing decision the final decision of the Commissioner. 20 C.F.R. §§ 404.955, 404.981. On July 12, 2012, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

<u>Personal and Vocational History</u>

Plaintiff was 42 years old on the date of the ALJ hearing. (Tr. 42). She completed high school and some college. (Tr. 120). Her past relevant work included jobs as a customer service supervisor, sales department manager, director of marketing, and marketing officer. (Tr. 57-59, 143-50). Most recently, she was a customer service supervisor but her employment ended in December 2008 – after her alleged disability onset date of November 9, 2006. (Tr. 27, 98). Plaintiff treated her health problems while employed, but her employment ended because the company had a change in management philosophy. (Tr. 27, 54).

With respect to Plaintiff's daily activity, she said she laid down 30 to 40 percent of the time and slept between eight and ten hours a day. (Tr. 49). Once she woke in the morning, she said it usually took her about two hours to become functional and for her medication to make her pain more manageable. (Tr. 52). During the day, Plaintiff made her bed, washed dishes, and did laundry with rest breaks. (Tr. 52). She walked about a half mile a few times a week, sometimes up to a mile depending on how well she felt. (Tr. 46). On other days, Plaintiff did some stretching. (Tr. 47). She could drive to doctor appointments, pick up prescriptions, and pick up groceries from the store. (Tr. 53). However, she said she usually experienced around two "down days" during the week when she could not participate in her daily activities. (Tr. 47). Plaintiff characterized her condition as having remissions and relapses, and said she could sustain all typical activity while in remission. (Tr. 132).

Plaintiff said her pain increased with walking, lifting, lying down, twisting, sitting, bending, standing, reaching, and simple household chores. (Tr. 176). Her pain decreased with heat, rest, reclining, sitting, walking, ice, activity, standing, and reducing stress. (Tr. 176). Floating in a warm pool helped, but Plaintiff said she could not swim. (Tr. 45). She also claimed she experienced severe dry mouth and "Fibro Fog", which were side effects from her medication. (Tr. 50). Plaintiff told the ALJ she could not remember having a good day in over three and a half years. (Tr. 44).

Fibromyalgia and Degenerative Disc Disease

On September 9, 1999, an x-ray of Plaintiff's cervical spine revealed mild degenerative changes from C3-T1. (Tr. 204). On October 9, 1999, an MRI of her lumbar spine revealed a tiny posterior central L5 disc herniation without effect on the thecal sac or neural foramina, and MRIs of her thoracic spine and cervical spinal cord were normal. (Tr. 205). In October 2004, MRIs revealed L5-S1 degenerative changes with moderate disc space narrowing, a small central disc herniation lateralizing slightly toward the right deforming, and a mild T11-T12 disc bulge but no significant abnormality in her cervical spine. (Tr. 313-14).

Primary care physician Dr. Nam's notes from November 2005 – a year before Plaintiff's alleged onset date – indicated medication was "helping" and Plaintiff was "feeling great". (Tr. 289). She participated in physical therapy with Michael Kamienski in December 2005, and he reported Plaintiff experienced "95% improvement towards complete recovery". (Tr. 403). She did not return to Dr. Nam complaining of pain until December 2007, when she complained of "lower back discomfort" and was referred to massage therapy. (Tr. 288).

Plaintiff continued to treat her fibromyalgia with physical therapy from January 2008 to June 3, 2008. (260-62). She reported she hurt all over, had generalized pain, trigger points, and

3

soreness through the middle and low back regions. (Tr. 471). Physical therapist Mr. Kamienski reported Plaintiff's symptoms "fluctuated dramatically" between "having no symptoms, to having to stay in bed for the afternoon", but she reportedly had more good days than bad days. (Tr. 260). In Mr. Kamienski's June 3, 2008 report, he noted Plaintiff was responding favorably, gaining strength and functional ability, but still had pain symptoms. (Tr. 262).

In 2008, Plaintiff complained of pain in her lower back, neck, and head, along with muscle discomfort and tightness with tender points. (Tr. 282-85, 288). On February 18, 2008 and July 24, 2008, Dr. Nam stated Plaintiff was permanently disabled from any gainful employment, explaining her fibromyalgia and degenerative disc disease pain limited standing, walking, sitting, pushing, and pulling. (Tr. 366, 368). Plaintiff was prescribed a number of medications to treat her conditions, such as Flexeril, Vicodin, Lyrica, Gabapentin, Lorazepam, Ativan, and Fiorinal. (Tr. 281-89).

Plaintiff continued to see Dr. Nam for fibromyalgia and degenerative disc disease and on May 4, 2009, Dr. Nam reported Plaintiff had all-over pain and could not function in her daily activities. (Tr. 369). An examination also revealed 18/18 tender points. (Tr. 507).

Dr. Nam completed a medical source statement on June 22, 2009. (Tr. 382). He opined Plaintiff could lift up to ten pounds occasionally; sit for one hour at a time and four hours total during an eight-hour work day; stand 30 minutes at a time out of an eight-hour work day; and walk one hour total out of an eight-hour work day. (Tr. 382-83). He further found she could occasionally reach bilaterally but never push or pull; occasionally climb ladders, scaffolds, or stairs; occasionally balance, stoop, kneel, crouch, and crawl; and occasionally operate a motor vehicle. (Tr. 384-86).

4

On December 17, 2009, Dr. Nam advised Plaintiff to participate in water exercises two to three times per week. Subsequently, Dr. Nam completed another medical source statement on December 24, 2009. (Tr. 484). In that report, he limited Plaintiff to lifting ten pounds occasionally; standing and walking 30 minutes out of an eight-hour work day; and sitting one hour out of an eight-hour work day. (Tr. 484). He further found she should rarely or never climb, balance, stoop, crouch, kneel, and crawl. (Tr. 484).

On May 14, 2008, consultative physician Murrell Henderson, D.O., an occupational health specialist, examined Plaintiff at the state agency's request. (Tr. 252). He concluded Plaintiff had satisfactory range of motion in her digits and spine and also demonstrated satisfactory grip strength. (Tr. 253). Further, he noted no spinal or paraspinal tenderness. (Tr. 253). Plaintiff communicated effectively, had no deficiencies in hearing or speech, but had poor vision in her right eye. (Tr. 252). Nevertheless, she was able to drive. (Tr. 252). State agency physician William Bolz, M.D., reviewed Plaintiff's file in October 2008 and opined Plaintiff did not have evidence of a severe physical impairment. (Tr. 365).

Mental Health

William E. Mohler, M.A., performed a consultative psychological examination on May 7, 2008 and diagnosed Plaintiff with adjustment disorder with anxiety and depression. (Tr. 248-51). Mr. Mohler noted Plaintiff's mood was cooperative and her activity and energy levels appeared normal. (Tr. 249). Plaintiff's background suggested a history of anxiety and depression, and she indicated some depression due to her recent health issues. (Tr. 249). During the interview with Mr. Mohler, Plaintiff denied a history of anxiety, but was taking anti-anxiety medication at that time. (Tr. 249). She exhibited no "suicidal or homicidal ideation and no overt sign of depression during the interview". (Tr. 249). Mr. Mohler calculated her global assessment of functioning

5

(GAF) score as 60[1] for symptom severity and 70[2] for functional severity. (Tr. 251). He concluded Plaintiff had no limitations in her ability to understand, remember, and follow instructions; mild-to-moderate limitations in her ability to relate to others and withstand the stress and pressure of day-to-day work activity; and moderate difficulties in her ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks. (Tr. 251).

State agency psychological consultant John Waddell, PhD. reviewed Plaintiff's case and concluded she retained the capacity for simple, routine tasks requiring no more than superficial interaction with others and routine job stressors. (Tr. 279).

ALJ Hearing

At the hearing, Plaintiff claimed she could not work because of chronic, head-to-toe, all-day pain caused by fibromyalgia and degenerative disc disease. (Tr. 43). She described sharp, stabbing pain in her head and neck that spread through her arms, hands, wrists, and back. (Tr. 44). She said the pain went through the sciatic nerve to her legs, ankles, and feet, explaining the pain occurred daily and was typically an eight or nine on a ten-point scale. (Tr. 44). Plaintiff further stated she could not remember having a good day in over three and a half years. (Tr. 44).

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 32–33 (4th ed., Text Rev. 2000) (DSM-IV-TR). A higher number represents a higher level of functioning. *Id.* A GAF score of 51–60 reflects moderate symptoms (e.g., flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 3.

2. A GAF score of 61–70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV-TR, at 34.

The ALJ asked the VE to assume a hypothetical worker of Plaintiff's age, education, and work experience, who would be able to sit, stand, or walk for six hours of an eight-hour work day; and lift, carry, push, or pull ten pounds frequently and up to 20 pounds occasionally. (Tr. 59-60). The worker would be limited to "simple, routine tasks where there is no requirement for arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others; and is also limited to no more than superficial interaction with supervisors, coworkers, and the public." (Tr. 59). The VE testified such a person could not perform Plaintiff's past relevant work but could perform the jobs of bench assembler (800 jobs in northeast Ohio; 110,000 nationally), wire worker (700 jobs in northeast Ohio; 100,000 nationally), final assembler (600 jobs in northeast Ohio; 90,000 nationally), and other jobs. (Tr. 61-62). The VE then testified if the hypothetical worker was off task 20 percent of the time, he would be precluded from work. (Tr. 63-64).

ALJ Decision

On July 29, 2010, the ALJ found Plaintiff's fibromyalgia was a severe impairment, but she had the residual functional capacity (RFC) to perform a full range of light work. (Tr. 23, 26, 30). The ALJ evaluated Plaintiff's pain and found her medical impairments could reasonably be expected to cause the symptoms alleged, but her statements concerning the intensity, and limiting effects of the symptoms were not credible because they were inconsistent with the record. (Tr. 27). Specifically, the ALJ compared Plaintiff's testimony that she had "not one good day in three and a half years" to her statements describing her impairment as "relapsing and remitting, and in relapse being able to sustain all types of activity". (Tr. 29, 44, 132). The ALJ also noted Plaintiff's physical therapist said Plaintiff had good attendance and reported more good days than bad. (Tr. 29, 260). The ALJ determined the evidence regarding Plaintiff's daily

7

activities was consistent with an RFC for light work because she could care for her personal needs, perform light household chores, shop, and drive. (Tr. 29).

The ALJ did not give full weight to Dr. Nam's opinions because his reports were inconsistent with each other and were not supported by the evidence as a whole. (Tr. 28). The ALJ referenced Dr. Nam's June and December 2009 reports, which had different findings without any explanation that would suggest a decline in functioning during the six month period between reports. (Tr. 28). Furthermore, the ALJ concluded Dr. Nam's opinions were conclusory and appeared to be based on Plaintiff's subjective complaints rather than objective clinical findings. (Tr. 28). He also noted Dr. Nam was an internist, not a rheumatologist, and there was no evidence he had special training in diagnosing or treating fibromyalgia. (Tr. 28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); see also 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

2. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); see also *Walters*, 127 F.3d at 529.

9

**DISCUSSION**

Plaintiff argues the ALJ erred in three ways. First, she claims the ALJ failed to grant appropriate weight to the opinion of her treating physician, Dr. Nam. (Doc. 13, at 9). Second, she contends the ALJ erred by not properly evaluating her credibility and complaints of pain. (Doc. 13, at 12). Last, she argues the ALJ should have recognized her psychiatric impairment as a severe impairment. (Doc. 13, at 15).

<u>Treating Physician</u>

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242. A treating physician's opinion is given "controlling weight" if it is supported by: (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the

opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009). Good reasons are required even when the ALJ's conclusion may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows his physician has deemed him disabled and might be bewildered when told by an ALJ he is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.*

Plaintiff alleges the ALJ did not give proper deference to her treating physician Dr. Nam. (Doc. 13, at 9). She argues the ALJ failed to take into account Dr. Nam's medical opinions regarding Plaintiff's inability to perform work and work-related activities, pointing to the February 18, 2008 and July 24, 2008 reports in which Dr. Nam indicated Plaintiff was permanently disabled from any gainful employment due to her fibromyalgia and degenerative disc disease. (Doc. 13, at 9); (Tr. 366, 368). Plaintiff notes Dr. Nam also reported Plaintiff had pain all over and many limitations in her everyday activity. (Tr. 369, 383, 484-85).

11

Fibromyalgia is considered a severe impairment that can entitle a claimant to benefits; however, a mere diagnosis without more evidence does not necessarily entitle a person benefits. As the Sixth Circuit has said, "[a] diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits . . . . Some people may have a severe case of fibromyalgia as to be totally disabled from working but most do not and the question is whether claimant is one of the minority." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (citing *Rogers*, 486 F.3d 234; *Preston*, 854 F.2d 815). The ALJ reviewed Dr. Nam's medical records and the rest of the record to determine whether Plaintiff's conditions rendered her unable to engage in gainful employment.

Substantial evidence supports the ALJ's conclusion that Dr. Nam's opinions were conclusory and appeared to be based on Plaintiff's subjective complaints rather than objective data or clinical findings. (Tr. 28). In February and July 2008, Dr. Nam reported Plaintiff was permanently disabled and unable to work. (Tr. 366, 368). However, "[t]he regulations provide that some statements by physicians – specifically, statements from medical sources that you are 'disabled' – are not considered medical opinions, but rather administrative findings that would direct the determination of disability." 20 C.F.R. §§404.1527(d), 416.927(d); *see also* SSR 96-5p, 1996 WL 374183. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine you are disabled. 20 C.F.R. §§404.1527(d), 416.927(d). Rather, these opinions are issues reserved to the Commissioner and an ALJ is not required to give these opinions controlling weight or special significance." *Id*.

Further, as the ALJ pointed out, Dr. Nam's June 2009 and December 2009 reports were inconsistent with each other and not supported by the evidence as a whole. (Tr. 28, 382-87, 484-85). In June 2009, Dr. Nam indicated Plaintiff could occasionally reach, balance, stoop, kneel,

12

crouch, crawl, and climb ramps or stairs, but in December 2009 he indicated she could never do those activities. (Tr. 382, 484). Nothing in Dr. Nam's opinion explained or supported a decline in functioning over a six-month period. (Tr. 28). The opinions also indicated Plaintiff was practically bedridden, which was inconsistent with reports showing she could do household chores, shop, and was advised to swim or do aquatic exercises up to three times a week. (Tr. 387, 517). Dr. Nam's opinions were also inconsistent with physical therapy notes stating Plaintiff had good attendance and more good days than bad days. (Tr. 260-62). Furthermore, Dr. Nam's opinions were inconsistent with occupational health specialist Murrell Henderson's report indicating Plaintiff was alert, healthy, and cooperative, demonstrated satisfactory range of motion in the digits and spine, and had satisfactory strength. (Tr. 253).

Substantial evidence supports the ALJ's conclusion that Dr. Nam's opinions were inconsistent with each other, the record as a whole, and not supported by sufficient clinical findings. Nevertheless, the ALJ did give some weight to parts of Dr. Nam's opinion which were consistent with Plaintiff's RFC to perform light work. (Tr. 28, 382-87). The ALJ pointed to Dr. Nam's opinion indicating Plaintiff could sit for four hours, stand for 30 minutes, and walk for an hour during an eight-hour workday. (Tr. 383). He also pointed to Dr. Nam's report indicating Plaintiff could occasionally balance, stoop, kneel, crouch, crawl and climb ramps or stairs, and could shop, travel, and ambulate without an assistive device. (Tr. 385, 387). The record supports Plaintiff's ability to perform these activities because Plaintiff stated she could perform household chores, shop, drive, and go for walks. (Tr. 45-52). Because the ALJ gave good reasons for the weight he assigned Dr. Nam's opinion , he did not err.

Plaintiff's Pain and Credibility

The Sixth Circuit recognizes that pain alone may be disabling. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). However, statements about pain or other symptoms do not alone establish disability. *Felisky v. Bowen*, 35 F.3d 1027, 1037 (6th Cir. 1994). The regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529; *see also* Social Security Ruling (SSR) 96-7p, 1996 WL 374186. In order for a claimant's assertion of pain to be considered disabling, there must be: (1) objective medical evidence of an underlying medical condition; and (2) objective medical evidence confirming the severity of the alleged disabling pain, or whether the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Felisky*, 35 F.3d at 1038.

Fibromyalgia is an "elusive" and "mysterious" disease, and symptoms include severe musculoskeletal pain, stiffness, fatigue, and multiple acute tender spots at various fixed locations on the body. *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and systematic elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston*, 854 F.2d at 820). There is no laboratory test for the disease's presence or severity. Physical examinations usually yield normal findings in terms of full range of motion, no joint swelling, normal muscle strength, and normal neurological reactions. *Id.* at 818. "There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion." *Id*.

Because it is difficult to determine if a claimant is disabled from fibromyalgia with objective medical evidence, it is important to evaluate the claimant's subjective pain symptoms. *Felisky*, 35 F.3d at 1038. The "ALJ is not required to accept a claimant's subjective complaints

14

and may . . . consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination."). Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms: In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

The ALJ followed the necessary steps in evaluating Plaintiff's pain and found her medical impairments could reasonably be expected to cause the symptoms alleged, but her statements concerning the intensity and limiting effects of the symptoms were not credible because they were inconsistent with the record. (Tr. 27).

Plaintiff's testimony was inconsistent regarding the duration and frequency of her pain. She described her pain as an eight to nine out of ten on a daily basis and said she had not had a good day in three and a half years, but she also alleged her condition had remissions and relapses, explaining she could sustain all types of activity while in remission. (Tr. 29, 44, 132). Plaintiff's physical therapist also reported she had more good days than bad days and said her symptoms fluctuated dramatically between no symptoms and having to stay in bed. (Tr. 260). The ALJ also pointed out that her alleged onset date reverted back to a time she had still been employed, noting her physical condition did not cause her to leave her job. (Tr. 29, 43). Indeed, Plaintiff testified she left her employment pursuant to a mutual agreement after the company underwent a change in management philosophy. (Tr. 29, 54-55). Based on the evidence, the ALJ reasonably concluded Plaintiff did not experience a change in symptoms or functioning around the time she left her employment. (Tr. 53, 290). Thus, the evidence did not support concluding Plaintiff's condition was worse than it was when she still worked.

Additionally, Plaintiff could perform household chores, cook, shop, drive, care for her personal needs, occasionally go for walks, and stretch. (Tr. 25, 29, 46-47, 52-53, 133-34, 250, 253). These activities were consistent with Plaintiff's RFC to perform light work and

inconsistent with her allegations of pain, including her statement that she had not had a good day in over three and a half years. (Tr. 29, 44). Plaintiff's statements were also inconsistent with Dr. Nam's treatment notes instructing her to engage in aquatic exercises two to three times a week. (Tr. 517). Plaintiff stated, "I'm not supposed to swim in anything lower than 75 [degrees]", but she immediately tried to clarify by saying she could not to do anything more than float. (Tr. 45). However, the ALJ reasonably concluded Plaintiff's statement was not credible because Dr. Nam would not have suggested she swim or perform aquatic exercises if Plaintiff were not capable of such an activity. (Tr. 29, 517).

In reviewing the record, the ALJ found no evidence Plaintiff's medications caused side effects that would significantly interfere with her ability to perform light work. (Tr. 29). Though Plaintiff stated her medication caused severe dry mouth and a "foggy" mental feeling, no treatment reports indicated any complaints of side effects. (Tr. 48).

The ALJ properly evaluated Plaintiff's credibility and substantial evidence supported his determination. *See* 20 C.F.R. § 404.1529(c)(3).

Mental Impairment

Plaintiff's last argument stems from the ALJ's obligation at step two of the disability analysis to determine whether a claimant suffers a "severe" impairment – one which substantially limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009). But the regulations do not require the ALJ to designate each impairment as "severe" or "non-severe"; rather, the determination at step two is merely a threshold inquiry. 20 C.F.R. § 404.1520(a)(4)(ii). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments,

even those that are not 'severe.'" *Nejat*, 359 F. App'x at 576 (quoting SSR 96-8p, 1996 WL 374184, at *5) (emphasis in original). In other words, if a claimant has at least one severe impairment, the ALJ must continue the disability evaluation and consider all the limitations caused by the claimant's impairments, severe or not. And when an ALJ considers all a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments does not constitute reversible error. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

The ALJ noted treating physician Dr. Nam's diagnosis of fibrositis and degenerative disc disease. (Tr. 366). However, Dr. Nam did not suggest Plaintiff was limited mentally. (Tr. 25, 366). As the ALJ pointed out, the record contained no evidence Plaintiff had sought or participated in regular mental health treatment since the alleged onset date. (*See* Tr. 24); *see also Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) (Failure to seek treatment "may cast doubt on claimant's assertions"). Indeed, the only evidence of a mental impairment came from consultative examinations, not from doctors or counselors who treated Plaintiff. (*See* Tr. 248-51). Furthermore, during one consultative examination, Plaintiff indicated no history of anxiety or depression, and consulting psychologist Mr. Mohler found Plaintiff showed no overt signs of depression. (Tr. 249). The ALJ reasonably determined Plaintiff's mental impairments were not severe; nevertheless, the ALJ still considered Plaintiff's symptoms revealed in the consultative exams on Plaintiff's ability to perform work.

The ALJ determined Plaintiff had no restriction in her activities of daily living or social functioning because the record showed she could perform chores, take care of personal needs within her limitations, and get along with others. (Tr. 25, 387, 486). The ALJ found Plaintiff had mild difficulty maintaining concentration, persistence, or pace because Mr. Mohler indicated

18

Plaintiff had some problems with attention span and distractibility. (Tr. 25, 251). Plaintiff argued the ALJ did not give Mr. Mohler's opinion appropriate weight and pointed to Mr. Mohler's evaluation indicating Plaintiff's ability to maintain attention, concentration, persistence, and pace for simple repetitive tasks was moderately impaired. (Tr. 251). The ALJ found these limitations were only mild, noting he discounted Mr. Mohler's opinion due to the inconsistency between the high functional GAF score he assigned and his finding of moderate limitations in concentration, persistence, and pace. (Tr. 25, 251). A GAF score between 61 and 70 "indicates some mild symptoms or some difficulty in social, occupational or school functioning but generally functioning well." *DSM-IV-TR*, at 34. This is consistent with Plaintiff's work-related abilities in the record and the ALJ's determination that Plaintiff can perform a full range of light work. (Tr. 30). Though she had poor concentration, she could drive, read, watch television, and play cards and board games. (Tr. 135). The evidence from Mr. Mohler's psychological evaluation also revealed Plaintiff had adequate memory and a cooperative, friendly mood. (Tr. 25, 249). The ALJ adequately considered Plaintiff's limitations in concentration, persistence, and pace regarding her work-related abilities. Considering Plaintiff's level of functioning and lack of mental health treatment throughout the alleged disability period, substantial evidence supports the ALJ's evaluation of Plaintiff's mental impairment.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB benefits supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED

                                                      s/James R. Knepp, II
                                                    United States Magistrate Judge